You may be seated. Good morning, ladies and gentlemen. Good to see all of you here. We have a number of cases that were submitted on the briefs, and the first case on the oral argument calendar is Pacific Choice Seafood Company v. Ross. You may proceed. Good morning, Your Honors. May it please the Court, I'm Ryan Steen, appearing on behalf of the appellees Pacific Choice Seafood Company, Pacific Fishing LLC, and Sea Princess LLC. I'd like to reserve five minutes for rebuttal, please. So the Court obviously has the briefing in front of it. I think this case has been very thoroughly briefed before the Court. I'd like to take this opportunity to emphasize a few points related to the manner in which NMFS determined the 2.7% maximum share that's at the center of this case. The first point I'd like to make there is the manner in which NMFS did that guts that statutory term of any real meaning. The statute directs the agency to, quote, permitted to hold, acquire, or use. But if you look at the briefing submitted by NMFS in this case, they justify that maximum share on a whole bunch of other provisions in the Magnuson Act except for that specific limit. So, for example, they justify the limit based on social considerations and social objectives citing the provisions such as 16 U.S.C. 1853, bear with me here, AC5A, which are the provisions that require NMFS to take into account certain factors to determine the initial allocation. That's different than the maximum share provision. They also cite to 1853, 53 AC5C, which are measures that the agency is allowed to take to assist small communities and small vessel owners. That's also not the maximum share provision. Okay. Counsel, I take it you don't dispute that our analysis of the agency's interpretation of this provision is subject to Chevron? Is that right? Correct. So, are you making a Chevron step one argument? Or are you saying that the agency's resolution of the ambiguity is unreasonable at step two? I think it could be resolved at either step. Well, then, taking step one, what is it in C5D and the reference to excessive share that directly speaks to the question of what factors the agency may consider in deciding what's excessive? So at Chevron step one, I will admit that the term maximum share could be characterized as ambiguous. What does maximum share mean? But when you look at the structure of the statute, it must mean something different than all of these other factors that are identified in the provisions right around it. So, for example, that maximum share provision is found in C5D2 or in C5D1. In C5D2, it directs NIMS to, as an and, implement other measures to address an inequitable concentration. Factors addressing small vessels and communities are addressed in the provision immediately before that, C5C. And so the agency had a bunch of other tools to use in addition to its obligation to identify a maximum share. That word maximum has to have some meaning. And so I would submit that at Chevron step one, it is clear from the statute that maximum share must mean something other than those other social factors and that maximum has to have some meaning. But maximum by itself only means maximum. That is to say, you get a top number, but maximum doesn't tell you what goes into the top number. So saying that maximum excludes just by saying the word maximum doesn't get you where you need to get, I think. And so at Chevron at step one, then maximum is, if you just take the word maximum in isolation, outside of the context of the statute, is subject to different meanings. But if you go to Chevron step two, whether that's what the agency did as a reasonable interpretation, the share that it arrived at here, 2.7%, has its root. The only analysis of where that comes from in the record is from a council subcommittee that evaluated how it's going to come up with something that could be in this maximum share. And so it prepared a report that was presented as kind of tentative and for the council's further feedback and consideration where they presented a range of numbers and said the maximum share should be, in that committee's view, the share that would allow every vessel owner in the fishery to have a chance at achieving a reasonable profit. Nothing to do with market power. Just what are we going to allow people to have a chance to do? That went to the next committee over, and they picked out of that range a midpoint, which was the 2.7%, and the only rationale they gave was it's a midpoint between the numbers. That was then rubber stamped by the council and rubber stamped by NIMF. So if maximum here is a limit that has nothing to do with market power on the record, and I think it is undisputed that market power has to have some role in determining the maximum share, but if 2.7% doesn't consider market power at all, and based on the record before us it's a midpoint between a range of numbers that also didn't consider market power, at Chevron Step 2 that's not entitled to deference. It's not a reasonable interpretation of the statute. How can something that's a midpoint of numbers that are far below the number that was identified elsewhere in the record, as the limit where you could even have a chance at market power? How can that be a maximum share? I know you say they didn't consider market power, and I may have some questions about that, but to be clear is it your position that market power is the only consideration they can take into account, or do you think it's just that they have to take it into account and maybe they can consider other things as well? So I think they can consider both. The other things play a larger role in those other provisions I referred to that allow them to come up with measures to address the needs of small vessel owners and small communities, and in 5D2 that allows them to come up with other measures to address inequitable concentration. When you're left with maximum share, the driving force behind that, if you look at the structure of the Magnuson Act and how the agency has applied that, is market power. Now, can they consider other factors? We would submit that, yes, they can, but they can't just ignore the market power, which is what the record would suggest happened here. The 2.7% had nothing to do with market power, and that's where we're arguing the agency has gone wrong. They at least had to play a role in coming up with a maximum limit. But they did. In the Notice of Proposed Rulemaking, they did identify market power as one of the factors that they recognized they needed to consider, and then they did an analysis of concentration in the industry. Why isn't that sufficient consideration of market power? So just because they generally cite to market power as a reason doesn't mean that that's what actually happened. When you look at how 2.7% was calculated, it was based on an analysis of what was required to allow every vessel owner in the fishery to have a chance at generating a reasonable profit. There was a separate market analysis performed, and that's the Herfindahl Index Report that's referred to in the briefing. That was a true analysis of market power, and it concluded that you could have a share anywhere up to 10% that absolutely would not result in any kind of market control or market power in the fishery, and that from between 10% and 18%, concentration wasn't guaranteed but became possible. But isn't that consistent with what you just said, that they looked at it, they thought about market power, and then they said, well, we're also going to look at some other things, and so we're going to go below the 10% based on the other things. It's not consistent with it because there's no discussion of the market power report in the report that came up with the 2.7% number. It had nothing to do with the 2.7% number. So 2.7% could have been preventing market power, 3.5% could have prevented market power, 7.5% could have prevented market power, but there was no analysis of any numbers other than this 2.7% that could have still accomplished this goal of having a maximum share. And just as an example to show a way that this could have been done properly, this example is provided in the briefing. It's the ITQ program for the New England Multispecies Fishery. So in that case, the agency directed an outside contractor to perform a similar market power analysis report, and it directed them to look at the levels at which the prices of the fishery's output or the prices paid for lease quota could be used to somebody's advantage, which was also called market power. They explained in their proposed rule what they did. They explained how they were interpreting excessive share to be market power, and they explained this report that was done. That report was given to the Center for Independent Experts for review. NIMS then considered that, and in its final rule, the agency itself presented its analysis of that report, its interpretation of the term excessive share, and determined that the share for the fishery on quota should be 15.5%, and they also imposed a limit on permits. But that's an example of how this should have been done, but none of that was done here. And when you really look at the record for the 2.7%, it has nothing to do with market power, and it is solely about how could we socially engineer this fishery to allow every boat owner to have a chance at a reasonable profit. And that's the nut of the case, and that's why we're here today. I see I have 4 minutes and 40 seconds left. What would you like to reserve? So unless you have other questions, I would reserve more time. Thank you, Counselor. Good morning, Your Honors. I'm David Gunter from the Department of Justice here on behalf of the National Marine Fishery Service. Limited access privilege programs are a mechanism that Congress created in the Magnuson Act to solve the chronic problem of too many people chasing too few fish. But the solutions to that problem are not solely economic. Congress directed the councils and the service to consider other factors in designing limited access privilege programs, and some of those factors relate to market power. Some of them relate to social issues. The reason this court has to affirm the judgment of the district court is that Congress commanded the service to take all of those factors into account when promulgating any fishery management measure under the Magnuson Act, and that's why it gives so much responsibility to the councils. They're made up of stakeholders that can provide input on social factors, economic factors, biological and wildlife factors that the service can then use to promulgate regulations. I'll start by talking about this question of how to interpret the phrase excessive share in the Magnuson Act. The service has interpreted that phrase in a number of places. I would point the court to Supplemental Excerpt 118, which is in the EIS, where the service says what constitutes excessive shares, maybe socially determined or maybe economically determined, and that's really the question before the court today, is that statement correct? Can the service take into account social factors or does it have to look only at economic factors in making its decision? And as Judge Miller has pointed out, that's a Chevron question that's analyzed under the two-set standard. Plaintiffs can only prevail if the statute unambiguously commands the service to take into account only market power in setting that maximum share. I think you would agree, though, that you have to take into consideration market power, correct? Yes. So explain to me in this record, aside from the notice, how did the agency take into consideration market power? The best place is the memo that references the Herfindahl Index, which is, as Mr. Steen said, the maximum share that would not pose market concentration problems. So Herfindahl says 10% and above 18% might be an issue, right? That's right. And the range of options the council was looking at here were all well below that. So to give you an example, we started out with about 117 vessels in this fishery. If we had set a 10% accumulation limit, that means that that fishery could go down to as many as 10 vessels before you started having economic efficiency problems related to market power. But the service didn't want this fishery to be only 10 vessels. It has a statutory mandate to consider the effect that its rules will have on single-vessel owner-operators, on the structure of fishing communities. And so it had to balance the interest of consolidation, which it wanted to have some consolidation. That's how you realize the biological and economic benefits of a quota program. But it didn't want to have so much consolidation that you would be down to a number of vessels that would essentially destroy some of the fishing communities that are at issue. And that's coming directly from the statute. Section 1853A says that limited-access privilege programs must ensure fair and equitable allocations, take into account the historic participation of fishing communities, and include measures to assist small-vessel owner-operators. That's all before you get to the maximum share provision, and it goes into the interpretation of the maximum share provision. And then that provision has two parts. One is simply that the service has to set a maximum share expressed as a percentage. There's no substantive value associated with that provision. Instead, you go on to the next provision, where it authorizes the service to include any other limitations or measures necessary to prevent an inequitable concentration of fishing privileges. An inequitable concentration is the only substantive value judgment that is stated in that statutory provision that requires a maximum share. So if we think about this at Chevron Step 1, the statute definitely places an upper limit on the excessive share provision. A higher percentage allows more consolidation, and the service can't let that percentage get so high that it consolidates to an inequitable degree. But there is nothing in the statute that unambiguously commands the service also to put a lower limit on the excessive share provision. There's nothing that commands the service, that is, to allow any particular degree of consolidation before the accumulation limits are reached. Instead, that's an issue that's simply left to the service's expert discretion. It's, as you know, a highly technical issue that requires a lot of inputs, and it's the kind of thing that the councils, with their different stakeholders that are able to come together and discuss these issues, are able to work out and then recommend to the council for a resolution. Now, the plaintiffs have asked, okay, but where does this 2.7% number come from? I think there are two particular places in the record that I would direct the court's attention on that question. One is the Groundfish Management Team Memo, which is at ER 555, and the other is the EIS Appendix Discussion of Accumulation Limits, which is at Supplemental Excerpts 137. That's particularly important because it's a long discussion of how the accumulation limits and the grandfather clause and the control rules all relate to each other as the service is trying to balance the social considerations and the economic considerations that Congress commanded it to balance in the Act. And what's more, well, that section in particular explicitly talks about how limits need to preserve the small business owner-operator structure of these fisheries. There's a section there at SCR 115 called How Accumulation Limits Help Communities. And so the service started with a range of accumulation limits, about 1.5% to about 3%, that would approximate the historical average annual catch per permit. That's how it took into account its mandate to preserve the historical structure of the communities. And then it did two kinds of economic analysis based on those limits. One is the Herfindahl Index, which we already discussed, to talk about market power, and the other is about the service's other potential management objectives, like managing the structure of the fishery as a whole. As I mentioned before, the service wanted to allow some consolidation because this fishery was barely breaking even. It had more than 100 vessels and each had an average annual revenue of about $200,000, which was not enough to be profitable. And so the service wanted to set accumulation limits that would allow some consolidation up to about 30 to 40 vessels with an average annual revenue of about $700,000, which it thought was a fully rationalized fishery based on its economic analysis. But then it set accumulation limits higher than that, allowing revenues of more than $1 million in some cases in order to preserve the variety of fishing strategies that already exist in the community, that is, vessels that want to specialize in a particular species so that they can have economies of scale and focus on one kind of fish in particular. So the groundfish management team did an economic analysis of all this and sent it to the groundfish advisory subpanel, which is made up of industry representatives. Now, they did pick a midpoint in that range of values, but that midpoint doesn't represent an arbitrary choice. There's a spectrum here where the low end of the percentage allows less consolidation and more boats to operate in the fishery, and at the upper end, a higher percentage allows more consolidation and has the potential to drive more people out of the fishery. And the groundfish advisory subpanel, in choosing a medium value out of those options, was explicitly... I'm sorry, not explicitly, but was balancing those two values and saying we're essentially going to be neutral between these values and choose a reasonable value in the middle. And this court's precedent in San Luis and Delta Mendoza Water Authority allows that. It says that you can have a choice that is in a sense arbitrary in that the record that the agency has could justify a number slightly higher or slightly lower, but that's not the kind of arbitrariness that's captured by the Administrative Procedure Act, and that's the kind of submission we're making here. This record could potentially have allowed the service to choose 3% or to choose 2.5%, and yet the record shows that the service took all of the relevant factors into account, considered market power, realized it wasn't a problem, considered its other management objectives, considered what its various options might do to the structure of this fishery, and chose one that would meet its overall goals. In order for those accumulation limits to work, though, you need to have a control rule that avoids loopholes that would allow one entity to control too much of the quota share through different corporate entities that may or may not be related. Whether the control rules here are consistent with the Magnuson Act is another question of statutory interpretation, and again, the statute says two things. It says that the service has to establish a maximum share that a privileged holder is permitted to hold, acquire, or use, and it authorizes the service to establish any other limitations or measures necessary to prevent an inequitable concentration. So the court has two places to look to decide whether the services rule, which is a simple rule about the amount of quota share that one entity can own or control, fits within that congressional mandate. Here, the phrase hold, acquire, or use contains several overlapping terms that together suggest that Congress had a broad view of how quota share should be deemed to be held by entities. And the services regulatory phrase, own or control, captures the sense of hold, acquire, or use. But also, the court needs to look at inequitable concentration, and in particular, the authorization to the service to establish any other limitations or measures necessary. That's a classic delegation of authority to an agency that the court has to evaluate at Chevron Step 2. And the service here reasonably interpreted that phrase to prevent entities from taking advantage of loopholes based on their corporate structure. One thing I want to emphasize, though, is that that doesn't mean that these entities have to stop fishing. The service said in the EIS that we understand our accumulation limits may require owners of multiple permits, eventually, to divest some of their quota share, but that they can always lease back quota pounds from other owners so that they can continue their historical fishing effort. And the reason for that is economic. If they are the most efficient fisher for the species that they're targeting, then they should be able to lease quota pounds from somebody else so that the most efficient vessel goes out and does the fishing. But what that does is it requires those entities to get their quota pounds at a market rate that will distribute the benefits of this public good throughout the participants in the fishery, rather than concentrating those benefits in the hands of one entity that can get a sweetheart deal from its corporate partners. Unless the court has questions about any of these issues, I'll just close with the idea that this accumulation limit, this 2.7% limit, is one of dozens of accumulation limits in this rule. And the accumulation limits themselves are only a small part of the trawl rationalization program that Amendment 20 represents. Congress couldn't make all of those decisions itself about how all of these factors should be balanced and what the different percentages exactly should mean. It left that job to the counsel and the service. I think here the court has a deep and broad record in which the counsel and the service both go into a significant amount of detail about the factors that they took into account in making their decisions, the public input they received, and how they balanced the factors that Congress put before them in the Magnuson Act. And for that reason, this rule is reasonable, consistent with the statute, and the court should affirm. Thank you, counsel. Thank you. Rebuttal. Thank you, Your Honors. I'd just like to address a few points on rebuttal. The first is that I think helps to highlight the problem here is when you look at the initial allocation provisions of the statute, which are found at 1853 A.C. 5A. My clients here were given an initial allocation of a little over 5% of the share of the fishery, which is well below anything that the market power analysis that was done would create any kind of control or market power. That initial allocation by statutory mandate was considered fair and equitable. It later, our clients later had to divest about half of that amount as a result of the maximum share. So how can something that on one hand is by statutory definition fair and equitable, on the other hand be excessive and a product of an inequitable concentration? Nowhere is that explained in the record. If what the agency's purpose here was to say that our clients already had an inequitable concentration of fishing privileges in this fishery, then what it should have done is it should have said your initial allocation is going to be something less than what you already have based on these four factors, current and historical harvest, employment in the processing and harvesting sectors, investments in the fishery, and current and historical participation of fishing communities. Those are the factors that go into initial allocation. It didn't do that. It awarded an initial allocation, presumably based on these factors, and then separately identified a maximum share that didn't take into account at all this market power analysis and that had the result of our clients having to divest over half of the amount that they had built up in this fishery over decades through harvesting, investment in the fishery, employment in the fishery. You're not making the argument, or are you, that the initial allocation engendered some sort of reliance interest such that the agency couldn't later, by itself, the agency couldn't later set a lower maximum share, are you? Our argument's not that it created a reliance, but our argument here is that it shows how what they did is not a reasonable interpretation of the statute, because to me there seems to be just an inherent disconnect between an initial allocation that's fair and equitable, again, far below anything that the record suggests would be market power or an inequitable concentration, and then on the other hand, five years later I have to divest half of that because it's above the maximum share limit. There's no explanation of why the initial allocation isn't fair and equitable based on the four factors. And all the reasons the agency's giving the court today for why the maximum share should be where it is are those same types of social factors that are taken into account in the initial allocation. The Herfindahl Index Report is in the record, but the court has to look at how the agency actually considered it in the record. Just because it appears in there doesn't mean that NIMS, the agency charged with approving this program, gave it any kind of real consideration. And there's nothing in the record that will show any analysis by NIMS. The EIS that opposing counsel referred to just describes the rules in a general context. It doesn't do any additional analysis of 2.7% of the market power analysis or anything. It exists as an independent document in this record that's not considered in conjunction with the 2.7% or otherwise analyzed. So there's no indication that the counsel or NIMS looked at this problem and said, okay, we have a report saying market power won't exist possibly until after 10%. How are we going to rationalize that against the number that we came up with? How are we going to rationalize that against the fact we're going to award an initial allocation that's above what the maximum share is? And that's ultimately our argument here, is that the record that this court's been presented with just defeats the purpose of record review. The court has to have some role here, and we submit that the agency's analysis and its interpretation and its application can't be reasonably discerned. And I see my time's up. So thank you, Your Honors, for your time today. Thank you both for your arguments this morning. The case just argued to be submitted for decision.
judges: Thomas, W. Fletcher, Miller